UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JEFFREY D. LEISER,

        Plaintiff,

        v.                                  Case No. 23-cv-395-scd

JOHN BRETZEL, et al.,

        Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Jeffrey Leiser, who is representing himself, is proceeding on a Fourteenth Amendment due process claim in connection with two conduct reports he received at the Redgranite Correctional Institution (RGCI) in 2022. Dkt. Nos. 1 & 9. On December 6, 2024, Defendants filed a motion for summary judgment. Dkt. No. 25. On February 21, 2025, Plaintiff filed a motion for an evidentiary hearing and motion for sanctions. Dkt. No. 48. Because no reasonable jury could conclude that Plaintiff was deprived of a liberty interest during the 30-day disciplinary segregation he served at the RGCI in connection with the two conduct reports, the Court will grant Defendants' motion for summary judgment and will dismiss this case. The Court will also deny Plaintiff's motion for an evidentiary hearing and motion for sanctions.

### FACTS

At the relevant time, Plaintiff was an inmate at the Redgranite Correctional Institution. Dkt. No. 27, ¶1. Defendants are Sergeant (Sgt.) John Bretzel, Captain (Cpt.) Chad Keller, Deputy Warden Eric Barber, Lieutenant (Lt.) Butch Dodd, Corrections Program Supervisor (CPS) Joli Grenier, and Cpt. Terry Sawall. *Id.*, ¶¶2-10.

On November 23, 2022, at around 12:15 p.m., Sgt. Jennifer Nash (not a defendant) saw Plaintiff and other inmates socializing in the Dayroom when it was supposed to be "closed." *Id.*, ¶124. Sgt. Nash directed them to leave and go back to their unit. *Id.*, ¶125. Plaintiff responded that he was "going to go to school then" and started to walk away. *Id.*, ¶126. Sgt. Nash then directed another sergeant to *take* Plaintiff to his unit; and Plaintiff then stated that Sgt. Nash was "wasting" his time and started to walk away again. *Id.*, ¶¶127 & 128. Plaintiff later went to the law library (as he said he would), and he told the Education Director that Sgt. Nash was "doing things to intentionally upset people on the unit" and that she "should be careful, my brother has a lawsuit against her." *Id.*, ¶130. The Education Director told Sgt. Nash about Plaintiff's words, which prompted Sgt. Nash to issue an incident report about Plaintiff. *Id.*, ¶¶130 & 131. Sgt. Nash also later filed Conduct Report #294273 for violation of Wis. Admin. Code DOC §§ 303.18 (Threats), 303.28 (Disobeying Orders), and 303.53 (Being in an Unassigned Area). *Id.*, ¶132; Dkt. No. 31-17 at 1.

About two hours after the dispute in the Dayroom, at around 1:55 p.m., Plaintiff was walking on Main Walkway B with inmate Joshua Goldsmith after leaving the library. Dkt. No. 27, ¶¶20 & 21. According to Plaintiff, he stopped to talk to his brother (Loren Leiser) about the upcoming Thanksgiving holiday and complain about his interaction with Sgt. Nash from earlier in the day. *Id.*, ¶24. At that time, Sgt. Bretzel was also walking on Main Walkway B to go to his assigned post in the Restrictive Housing Unit (RHU). *Id.*, ¶20. According to Sgt. Bretzel, as Plaintiff walked past the H-Unit courtyard, he heard Plaintiff shouting through the fence at other inmates. *Id.*, ¶¶22, 23, 25, & 27. Sgt. Bretzel heard Plaintiff say, "Your fucking girl Nash has something coming to her!" "That Bitch thinks…" *Id.*, ¶26. Sgt. Bretzel was not aware of the incident from earlier in the day but understood "Nash" to be Sgt. Nash, who worked at the institution. *Id.*, ¶28. Sgt. Bretzel confronted Plaintiff about his statements—he told Plaintiff to stop yelling, return to his unit, and that he would be receiving a conduct report for inappropriate

2

and disrespectful comments towards staff.  *Id*., ¶¶29 & 30.  Later that day, Sgt. Bretzel issued Conduct Report #293774 for violation of Wis. Admin. Code DOC §§ 303.29 (Disrespect) and 303.18 (Threats).  *Id*., ¶31; *see also* Dkt. No. 31-1 at 1.

That same day, on November 23, 2022, Plaintiff was taken to Temporary Lock-Up (TLU). Dkt. No. 27, ¶36.  He gave the statement,

> "I made no threat to any staff member or about any staff member. I was talking to my brother Loren who is one (sic) HE And I told him I got into it with Nash and some guard told me not to talk through the fence and I kept walking to my unit I never said to anyone about a staff better watch herself. I don't threaten staff I know better!"

*Id*.  Cpt. Sawall reviewed Conduct Report #293774 and determined that it should proceed as a "major offense."  *Id*., ¶37  Cpt. Sawall determined that, if Plaintiff chose an "uncontested disposition," an appropriate sentence would be 15 days of disciplinary segregation.  *Id*.  On November 25, 2025, Lt. Dodd gave Plaintiff a copy of Conduct Report # 293774, the Notice of Major Disciplinary Hearing Rights (DOC-71), and the offer of 15 days disciplinary segregation for an uncontested disposition.  *Id*., ¶38.  Plaintiff declined the offer, so the next step was a Contested Major Disciplinary Hearing, and Lt. Dodd gave him DOC-73 to request witnesses and evidence for the hearing.  *Id*., ¶¶39 & 40.  Plaintiff submitted DOC-73 and requested that his brother and inmate Goldsmith serve as his witnesses; that Sgt. Bretzel be present at the hearing; and that videotape evidence from the hallway be played at the hearing.  *Id*., ¶42.  Capt. Sawall approved the request for witnesses; but denied the request for videotape evidence because it had no audio from which the allegations of what Plaintiff allegedly yelled could be confirmed.  *Id*., ¶¶43 & 44.  On November 30, 2022, Capt. Sawall reviewed Plaintiff's TLU status and determined that Plaintiff should stay in TLU until the disciplinary hearing because review of the other conduct report from Sgt. Nash (Conduct Report #294273) was still pending.  *Id*., ¶48.

On December 1, 2022, Plaintiff had his Contested Major Disciplinary Hearing on Conduct Report #294274.  *Id*., ¶50.  Lt. Dodd served as the hearing officer and CPS Grenier served as a

3

committee member. *Id*. Neither individual had any independent or prior knowledge of the allegations within the conduct report; played a role in writing the conduct report; or investigated the alleged incident. *Id*., ¶¶51 & 52. Lt. Dodd read the conduct report allegations aloud to Plaintiff. *Id*., ¶55. Plaintiff made an oral statement. *Id*., ¶58. After considering all of the evidence—including Sgt. Bretzel's description of the incident in the conduct report, Plaintiff's oral statement, Plaintiff's brother's oral statement, inmate Goldsmith's oral statement, Sgt. Bretzel's oral statement, and a sign posted on the H-Unit courtyard fence that says not to talk or loiter with inmates in the courtyard—CPS Grenier and Lt. Dodd believed it was more likely than not that Plaintiff shouted threatening disrespectful statements through the H-Unit courtyard fence. *Id*., ¶¶53-76. They imposed the previously offered sentence of 15 days disciplinary segregation. *Id*., ¶78. The following day, on December 2, 2022, Lt. Dodd told Plaintiff that Sgt. Sawall had determined that his other conduct report issued by Sgt. Nash (Conduct Report #294273) should proceed as a major offense and made an offer of 30 days disciplinary segregation for an uncontested disposition. *Id*., ¶134. Plaintiff accepted the offer that same day and began his disciplinary segregation. *Id*., ¶¶135 & 136. Plaintiff appealed the conduct reports and received a partial re-hearing to consider the videotape evidence that was previously excluded. *Id*.,¶¶ 94-100. The outcome of the rehearing remained the same, however. *Id*., ¶¶101-123.

Plaintiff served a total of 30 days disciplinary segregation for both conduct reports. *See* Dkt. No. 44 at 4 ("I was in RHU from 11/23/22 to 12/16/22, then moved to H-Unit North and placed in Step program where I was only allowed out for 1 hour a day, until 12/22/22 when I was taken off step). Between November 23 and December 16, Plaintiff served on "Step One;" and between December 16 and December 22, he served on "Step Two." Dkt. No. 27, ¶¶80 & 89; Plaintiff returned to general population on December 22, 2022. *Id*., ¶93. All inmates on disciplinary segregation (both Step One and Step Two) have a single cell with a bed, a mattress, a sink, a toilet, a shower, hygiene products, and an intercom to communicate with staff. *Id*., ¶¶84 &

4

87. While on Step One, inmates have access to the law library for at least one hour each week, weekly video visitation and phone calls, and one hour recreation in the "recreation cell," which has an open ceiling (to allow sunlight and fresh air) and a chain link ( to allow inmates to speak with other inmates on recreation at the same time.) *Id*., ¶¶ 85 & 86. Step Two provides more liberties than Step One, including more time out of the cell, use of the Dayroom, and daily time in the Courtyard. *Id*., ¶90. According to Plaintiff, while on disciplinary segregation he "could not access or buy an over the counter (OTC) medication." Dkt. No. 44 at 8. Instead, Plaintiff could only retrieve pain medication from medical staff, and they "refused to get my personal bottle out of my property." *Id*. at 11.

Eight months later, in August 2023, Plaintiff had his "yearly review" of his custody level, institution placement, and program needs. Dkt. No. 27, ¶137. The Committee recommended "continued" medium custody status at RGCI. *Id*., ¶138. The recommendation was based on multiple factors including Plaintiff's unmet treatment needs and his lengthy sentence (meaning, he was not eligible for parole or extended supervision). *Id*., ¶140. While the Committee did consider his two conduct reports, he was listed as "low risk" in association with institutional adjustment. *Id*., ¶139.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth

5

specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

The Fourteenth Amendment prohibits the states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To survive summary judgment on a Fourteenth Amendment due process claim, Plaintiff must demonstrate: "(1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient." *Felton v. Brown*, 129 F.4th 999, 1007 (7th Cir. 2025) (quoting *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019)). "It is well-established that prisoners have a protected liberty interest in avoiding segregated confinement when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Court looks at the "combined import" of the duration of the confinement *and* the conditions endured. *Ealy v. Watson*, 109 F.4th 958, 964–65 (7th Cir. 2024) (citing *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013)). Absent extremely harsh conditions of confinement, disciplinary segregation for a period of time less than six months does not typically trigger a liberty interest. *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (noting "six months of segregation is not such an extreme term and, standing alone, would not trigger due process rights."). Extremely harsh conditions include, for example, an "indefinite" segregation sentence where virtually all sensory and environmental stimuli are denied; very little human contact; denial of all clothing and bedding for extended periods of time; and disqualification from parole eligibility for an otherwise eligible inmate. *Id.*; *see also Wilkinson v.*

6

*Austin,* 545 U.S. 209, 223-24 (2005) (inmate denied human contact and subjected to lights during every hour of confinement); *Gillis v. Litscher,* 468 F.3d 488, 490–91, 493–94 (7th Cir. 2006) (inmate denied any bedding or clothing and deprived of nearly all human contact or sensory stimulation); *Westefer v. Snyder,* 422 F.3d 570, 589 (7th Cir. 2005) (inmate subjected to severe limitations on contact with others, showers, exercise, attorney visits, and access to personal property).

Once a liberty interest has been invoked, the Court looks to what process was due. *Ealy*, 109 F.4th at 965-66. An inmate who is facing transfer to disciplinary confinement is only entitled to "informal, nonadversarial due process," which leaves substantial discretion and flexibility in the hands of the prison administrators. *Id. (citing Adams v. Reagle*, 91 F.4th 880, 895 (7th Cir. 2024)). Informal due process requires only that an inmate be provided (1) "notice of the reasons for the inmate's placement" in confinement and (2) "an opportunity to present his views," for instance, in a written statement or at a hearing. *Id.* "[T]he Supreme Court has made clear that '[o]rdinarily a written statement by the inmate will accomplish this purpose…So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.'" *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)).

Plaintiff's 30-days disciplinary segregation does not, on its own, trigger a liberty interest. *See Means v. Larson*, 580 F. App'x 481, 482 (7th Cir. 2014) ("But [Plaintiff's] segregation term of just over one month, by itself, did not implicate a liberty interest."); *Lekas v. Briley,* 405 F.3d 602, 612 (7th Cir. 2005) (concluding that up to 90 days in segregation does not affect liberty). And Plaintiff alleges no other circumstances from which a reasonable jury could conclude that he experienced an "atypical and significant hardship" in relation to the ordinary incidents of prison life. It is undisputed that Plaintiff's cell had a bed, a mattress, a sink, a toilet, a shower, hygiene products, and an intercom to communicate with staff. Dkt. No. 45, ¶¶84 & 87. Plaintiff could also interact with staff during medication-times, meal-times, or shower days. *Id.*, ¶88. He could also

7

leave his cell for one hour each day to either go to the law library, make a phone call, or "get his show in;" and he could go to the recreation cell, which had sunlight, fresh air, and the ability to talk to other inmates, twice a week. *Id.*, ¶¶85, 86. 93.  He also did not have parole/extended supervision eligibility status that he could lose.  Plaintiff's 30-day confinement, in other words, was identical to everyone else who was on disciplinary segregation for violating of prison rules; and it, therefore, was not an "atypical and significant hardship" in relation to the ordinary incidents of prison life.  Plaintiff notes that he was not allowed to possess over the counter medication with him in his cell.  However, he admits that he was not altogether denied medication—he simply had to retrieve it from medical staff. And the loss of TV and radio privileges he complains about are standard in disciplinary segregation, as disciplinary segregation is intended to be punishment for violating prison rules.  None of the circumstances Plaintiff complains about constitute an "atypical and significant hardship."

Plaintiff's response materials focus solely on the nuances of the various procedural "errors" he believes he suffered during the conduct report hearing and appeal process.  *See* Dkt. Nos. 44-47.  He complains about the rejection of certain videotape evidence; the impartiality of the hearing officers (including the fact that one of the individuals participating in his conduct report hearing was allegedly placing stickers on Christmas cards during the hearing); and the truthfulness of the allegations in the conduct report and other evidence presented. *Id*.  But all of these issues are moot because Plaintiff was not deprived of a liberty interest in the first place. In other words, even if his arguments about improper procedures were legitimate—which they might have been given that he did ultimately receive a "partial rehearing" for the purpose of consideration of videotape evidence—it would not constitute a violation of the *federal* constitution because no federal liberty interest has been impacted.  Therefore, Defendants are entitled to summary judgment and the Court will dismiss this case.

## PLAINTIFF'S MOTION FOR AN EVIDENTIARY HEARING AND MOTION FOR SANCTIONS

On February 21, 2025, Plaintiff filed a motion for an evidentiary hearing and motion for sanctions. Dkt. No. 48. He states that Sgt. Bretzel's Declaration (Dkt. No. 33), Security Director Sawall's Declaration (Dkt. No. 28), and Captain Keller's Declaration (Dkt. No. 34) all contain "perjured testimony." *Id*. According to Plaintiff, Sgt. Bretzel's statements in the conduct report were allegedly different from Plaintiff's version of events and from what other Defendants allegedly said. *Id*. at 2-4. Plaintiff also claims that Sgt. Bretzel's statements in the conduct report were allegedly different from his statements at the conduct report hearing. *Id*. at 2-4. Additionally, Security Director Sawall's explanation that he denied videotape evidence because it did not have audio allegedly was not previously explained; and Captain Keller's statements also allegedly differ from Plaintiff's version of events. *Id*. at 5.

As noted above, Plaintiff's focus on the factual disputes regarding the due process analysis does not change the fact that Plaintiff never triggered a "liberty interest." No argument raised in Plaintiff's motion requires an evidentiary hearing because clarifying the circumstances regarding the due process analysis would not change the outcome of the case. Separately, the mere fact that Plaintiff's narrative of what happened differs from Defendants' narrative does not mean that their testimony is "perjured." That is the nature of civil litigation and opposing parties often have differing narratives about what happened from their perspective. Similarly, a Defendant providing additional information to clarify a prior statement also does not mean that the prior statement (or new statement) was "perjured." When questions and issues arise in litigation, parties are entitled to explain themselves. There is nothing improper about that circumstance and it does not show bad faith. The Court will therefore deny Plaintiff's motion.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED**; and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Plaintiff's motion for evidentiary hearing and motion for sanctions (Dkt. No. 48) is **DENIED**.

Dated in Milwaukee, Wisconsin this 31st day of July, 2025.

_____
STEPHEN C. DRIES
United States Magistrate Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.